Thank you, Your Honor. May it please the Court of Counsel, Lou Piccioni representing Davisco Foods. The issue is a trial for whether Davisco breached an express warranty or implied warranty of fitness for a particular purpose in connection with their sale of milk permeated to the Melenkamps. One of the major reasons that the verdict in this case should be overturned is the absence of proof of causation. Let me ask you a question as you're going on there. It's my understanding then there was never ever pled or argued an implied warranty of merchantability. That's correct. It's my understanding as well that you moved to have the negligence claims dismissed based on you can't get economic loss in a negligence action. That's right. And so now having moved to have the negligence claims dismissed, you still want to have a comparative negligence verdict. Is that your argument? I mean, to be fair, you got the benefit of the negligence being dismissed. We're now talking was there a breach of an express warranty or was there a breach of an implied warranty of fitness for a particular purpose, both coming right out of the UCC? Well, you give the warranty and then you determine if it was breached. How do you get the comparative negligence? Why should you compare? Your Honor, I guess we're kind of talking now about the target on the verdict form and whether there's a comparative causation. Or even you and the plaintiff. It seems to me that you want to have a comparison. We're not in negligence. You asked to have it thrown out. That's right, Your Honor. Out of the case. So now we're really asking were there oral statements or written statements made which were not true, breach, or did they know exactly what they were going to be using it on and how it was going to be used and say use this, and they did. And I don't see why comparison has any relationship to that. I guess two things, Your Honor. First, with regard to causation, even though it's a breach of warranty, express or implied, the plaintiff still has the obligation and burden to prove causation. In other words, the actual cause that this product caused their claim damages. And if I may continue on that line, and I will address the comparative causation issue, but I think it's important to understand, first of all, no permeate is essentially sugar and water. You've gone from comparative negligence to comparative causation? I'm sorry, Your Honor. You've gone from comparative negligence to comparative causation? Is that your argument? No. Those are the words you used. Okay. Those are the words you used. I apologize. I'm speaking about causation as this product, the plaintiff had the burden of proof, and I think the White House case and the other cases that we've cited support the argument that they had the burden of proof that this product caused the damages to the calves. This product caused them to get sick and their calves to die. The record seems replete with evidence, which looked at in the light most favorable to the decision, suggests that it was. The stuff transmogrified from lactose to lactic acid. It was because of a temperature change. The cows got sick. The cows got hurt. The cows died. Is that wrong? I would submit that it is, Your Honor. If I may explain why. Fire away. The plaintiff's veterinarian, Dr. Miltry, testified that if a nutritional issue is the cause of a problem, you have to look at more than just one specific ingredient in the total feed mixture to diagnose the problem. He also said that formulating a proper feed mixture for calves is a complex process. Now, the plaintiff's nutritionist, Cargill, was responsible for formulating a proper feed mixture, and Cargill prepared what are called batch mixing sheets. They're like recipes. They're part of the record. Some of the ingredients, such as corn silage, grain, and permeate, are acidic. But plaintiff's expert, Dr. Kurtz, testified that a small amount of acid can be beneficial for the calves. And Dr. Kurtz also testified that a decrease in alfalfa hay, while increasing percentages of acidic ingredients, can cause problems with calves. And so what the nutritionist needs to do in his expertise is to come up with a proper combination and amount of ingredients to safely feed the calves. Is causation an issue of fact? Yes, Your Honor. Well, for us to overturn an issue of fact determined by a trial court, it's got to be clearly erroneous. And one of our fellow sister circuits says that for something to be clearly erroneous, it has to have the stench of a seven-day-old, unrefrigerated dead fish, which means it really has to be so far out that no reasonable, awake, alive person with an IQ over room temperature would go that way. I mean, there seems to be lots of evidence in this case. Sure. If I may, Your Honor, the Inquis case from the ninth circuit talks about the substantial evidence standard, evidence that a reasonable mind might accept as adequate to support a conclusion. And I'm going to explain why it is that this is based on nothing more than speculation. If you look at DeVisco's trial exhibits H and J, these are the batch mixing sheets for the barn calves. The thing that worries me, and I guess Judge Trott's question gets to it, you can argue all the good evidence that you want, that your case is good, and that the jury should have gone with your case. But the bottom line is, what we have to do is look at the record and look at all the evidence that's there and say, is there enough evidence, which we would call substantial, hard enough to explain to non-lawyers that I might say no evidence, and say that there is none. And I guess I'm saying when I look at this record, somewhat like Judge Trott, how can I suggest there is no evidence to sustain what the jury did? The difference between an appellate court and a trial court. I understand, Your Honor. But my point is this. If you look at the batch mixing sheets and compare the diet before to the diet after, we have differences in not only ingredients. Just as important is the difference in percentage of ingredients. So then we have testimony from their expert and the veterinarian that says, hey, these other ingredients are acidic as well. So my point is, how can anyone look at one of the ingredients that is acidic, the permeate, where the corn silage is just as acidic. We have other changes in the diet that have been used, percentage changes in the ingredients. If you look at the corral calves, the batch mixing sheets, there's a decrease in the alfalfa. Hey, there's an increase in corn silage, wasn't even in the initial diet. And so we've added this admittedly acidic ingredient. So we look at a recipe and we say, well, we're going to pull out the permeate and say, well, that was the cause. What did your expert say the cause of the deaths was? We didn't present an expert, Your Honor. I know. That's not my point. Okay. I guess I would point out that the plaintiff's own testimony was the calves would not have had a problem if Cargill had included a buffer in the recipe and that he would have used the milk permeate again if the recipe included a buffer. And that's on page 136. The plaintiff testified, question, you told Mr. Schmidt that he messed up, didn't you, after this happened? Answer, yes. Question, you believe if he put a buffer into the feed mixer that he prepared for the barn calves and the corral calves that used the milk permeate that you wouldn't have had a problem, right? Answer, right. Do you dispute the proposition that milk permeates at the wrong temperature, turns into lactic acid, which is harmful to living creatures? My point, Your Honor, is that— Do you dispute that? Do I dispute that if it's left unrefrigerated, it would have a lower acidic level? Right. It would have a lower acidic level. But the point is, from plaintiff's own expert, a certain amount of acid is beneficial for the calves. Cargill has to incorporate each of the ingredients. So you could use that product— Is this your strongest point? I believe, Judge, that the causation issue based on the Chisholm decision is a strong ground for this Court to reverse this verdict. Chisholm points out that when there are one or more— one or more of which the defendant was not responsible, and it's just as reasonable and probable that the injury was the result of the latter, then the plaintiff may not recover since he failed to prove the defendant's preach caused the injury. And I think in this case, it's the total feed mixture, at best. We've made other arguments in our briefs as to why there are some other reversible issues. But let's just assume for a minute that what caused the injuries to this calf was a feed problem. If we assume that, at best, it's the combination, the feed mixture that caused— and the problems with these calves are about 150 deads, a couple other hundred. This was an 8,000-calf operation. So we have a very small percentage of calves that get injured. There's testimony from Dr. Milfreid that all the calves that were fed this mixture, we have a small amount that were injured. But my point is there that if we accept as true everything that the plaintiffs contend, then it's the feed mixture that caused the injury, not this particular ingredient. It's kind of like you're sitting down at a meal and you get food poisoning the next day, and the next day you want to just point back and say, well, it must have been the potatoes. Let me ask you a question. You were the one filing the motion to certify, weren't you? Yes, Your Honor. Are you still arguing for that? I think, Your Honor, that there were three issues on the motion for certification, the offset of the Corregill settlement, which I think there's no— Do you think you're still anxious for the Supreme Court of Idaho to think about those issues? Certainly we would be, Your Honor. Do you think they'd be better able to do that than what we have in front of us? I'm sure that Your Honor is very capable of making that decision on your own. That's a trap question. It did not fall into it. I felt pretty safe with that answer. The other—Judge, before I run out of time, I did want to reserve a couple of minutes, but the issue of Corregill on the verdict form, and this, I believe, is a de novo review issue. The Ninth Circuit in Galdemez holds that a party is entitled to have the jury instructed, based on that party's theory of the case, if that theory is supported by the law and the evidence. In this case, plaintiff himself testified that Corregill was at fault for not formulating a proper diet and that he relied solely on Corregill to generate a formula that was safe for his case. Your argument is really based on the idea that there's some allocation of fault in a breach of contract claim. Yes, Your Honor. And I can't find any case that suggests that if you're going to plead breach of an express warranty and breach of implied warranty of fitness for a particular purpose, that whatever happened otherwise has anything to do with the warranty you made. Judge, I would point to the Benoist case. Well, I don't think Benoist says that. Frankly, I know that there are cases in Idaho which would suggest that misuse of a product might nullify a breach, but it seems to me that's obvious with a breach of contract, that if you're going to misuse it, as long as it was the way it ought to be, that that would be something that would get you out of the breach. There are cases that say assumption of risk would nullify any breach, but that seems obvious too because every breach of contract case that I've ever sent to the jury, I've always given them a common law duty to minimize their damages, and did they minimize them in the first place? But I've never seen and can't find a case that says I've got to put two jury on a breach of contract case. I thought it was pretty great for you to argue economic damage rule that I now put two other parties on a breach of contract case to the jury to apportion negligence. Judge, I would say in the Benoist case, and granted there isn't a specific case directly on point that says that, but Benoist says, number one, in determining whether or not to include additional parties on the verdict form, the question is not whether a judgment order could be rendered against the person, but whether or not his conduct or his product caused or contributed to the accident and injuries. Clearly, we have the evidence of that. Plaintiff admits that. Secondly, the Benoist case says that once capability, blameworthiness, or some form of fault is determined by the trier of fact to have occurred, then the labels denoting the quality of the acts, whether it be strict liability, negligence, negligence per se, et cetera, become unimportant. Well, when we're talking about negligence and strict liability and negligence per se, we're talking about tort cases, and we're talking about something one might allocate, and we might have comparative negligence, but I can't find it in a contract case. Right. And I would point to, Your Honor, the Peterson case, the Chisholm case. I'm running out of time. Can we go to talk about a breach of warranty case can sound in tort, and it can also sound in contract. And it sounds in contract when the object of the alleged harm is the product itself. It sounds in tort when you have other consequential damages, and that's what we have in this case. I have 20 seconds for it. I'm sure that we've run you over, and my presiding brother will be charitable with you, but I have a couple of questions I'd like to squeeze in here, if you wouldn't mind. Certainly. I'm somewhat concerned about Exhibit 18 and Exhibit 25, and I'm sure that your adversary is going to explain to me why it was not air to allow them to be put in a breach that was not abuse of discretion. But on Exhibit 25, at page 38 of your brief, you point out that there are three grounds for objection and that you made two of them. You don't identify for me which were the two, because if you didn't object, I'm not going to probably pay much attention to it. What are the two grounds that you objected to, Exhibit 25, if you recall? The Exhibit 25 was the letter from the company to explain it. We know what it was. I'm sorry. We know what it is. No, I'm just confirming, because Exhibit 18, I believe, was the letter from Cargill. 18 is the letter of the Cargill letter saying why there's a problem. 25. Right, okay, yes. And the 25 is the concern one I have, because it has the $500,000. Right. I think our points that we had there, Your Honor, was that it was a settlement. Was it 408? And I believe hearsay and relevance, I believe, were the objections made on that, Your Honor. Now, you said there were three reasons it shouldn't come in. And you said in your brief at page 38 you made two out of the three. And I just wondered, that doesn't get you an objection to all three. You've got to make objections to all three. In your brief, in the case of one of them you didn't, I wanted to know which one you didn't object to. I'm sorry, Judge, I don't know that third one. Well, next time you write a brief, tell me. It will make it easier. I'm sorry, Your Honor. May I speak to Exhibit 18? I don't have any other questions. Okay. Thank you. All right, thank you. I don't think 18 is your problem. It's your adversary's problem. I'm walking into the lion's den. May it please the Court, David Heider, attorney for Appellant Counsel. Do you agree with the appellant that you never did plead breach of warranty of merchantability? Did you plead it? Specifically? Yeah. I read your complaint. It doesn't say anything about breach of warranty of merchantability. I saw no motions to amend for breach of warranty of merchantability. And that's the only breach that has anything to do with labels. So why should the Court give a label instruction to the jury when you didn't even argue or amend or plead anything to do with labels? The labeling issue was vitally important in this case. Well, if it was vitally important, then you're in trouble. Then you're in real trouble. I'm getting into there. I'm getting in there. It's vitally important because the Idaho administrative rules at that time required this product that Defisco sold to be labeled in accordance with the IDAFA rules. Well, but that doesn't have anything to do with my question. Right. If it was the truth, and we have argument in there that it isn't the truth, but the legislature done done it. But if it's the truth, there's only one warranty that has anything to do with labels. It's breach of warranty of merchantability. And you didn't plead that. It specifically was not pleaded. Strike specifically. What's that? Strike specifically. It wasn't pleaded, period. It wasn't pleaded. I'll give you that. It's clear from the complaint. The two breach of contract claims were breach of implied warranty of fitness for a particular and breach of express warranty as to the claims made by the defendant and the company. So with that... So the label doesn't have anything to do with that. No, it specifically has to do that. And if we look at... Well, they didn't warrant it. They didn't say anything about it. So the express is out either in writing or orally. And they certainly didn't give it as breach of warranty of implied fitness for a particular purpose because that is I need to have a formula for my calves. This permeates a good formula. Use that. That's what that's about. But if you're going to talk about the label, there's only one Idaho statute that talks about the label, and that's warranty of merchantability. Your Honor, I respectfully disagree with you. Well, where does it talk about anything else in the statute? I respectfully disagree in the fact that labeling is vitally important. If we look at the testimony of Dr. Kurtz, the expert in this case, he testified, to the best of my recollection, that a labeled versus an unlabeled product are two completely different products. And the reason why it's important is the fact that if a product is labeled, Mr. Mellencamp at that time would have had knowledge as to the dangerous propensities of this product and could have incorporated it appropriately. Now, with it not being labeled, what happens at that juncture is we don't know what it is, we don't know the dangerous propensities that it will occur. It's no different in an analogous situation. Which is exactly the breach of warranty of merchantability. Your argument is a merchantability argument and you didn't plead it. Well, it goes to letting the jury know exactly what this product was. And that was dangerous propensity. The thing that's bothersome to me, I have the same problem. This is one of the three issues that I have problems with. And this is one of them. The jury is discussing the implied warranties and all of a sudden they get a rule saying you got a label. They go in the jury room and they say there's no label, therefore they're guilty. But there's nothing in the pleadings that entitles the judge to give that instruction unless there's been a breach of marketability, which was never plead and was never part of the action. So I think, Judge Smith, this question is the same one that's bothering me, that we have some law given which does nothing to do with what the action was pled. And the jury instruction could be such that they would just go right to saying there's no label, therefore there's liability. So it's not only you don't have to demonstrate. You have to demonstrate it was right. We have to demonstrate that there was no prejudice. I think you'd have difficulty with both those issues. I just agree with you, Your Honor. Why? And the reason, let me explain it to you, is this product wasn't labeled. It's no different at the time that there was this label requirement, that it was no different than any type of animal feed, whether it is a cat food, a dog food. If it's not labeled, there's not instructions for its use, Mr. Millenkamp, and he cannot know how to feed that. If he doesn't know that, there's not these explicit warnings as to how to feed it or how to use it, which were required by statute at the time. Then, at that point, he does not know how to use it, and he can't properly utilize it, and then we have the situation what happened in this case is that his cats died. There was no specific instruction. If we look at that jury instruction, the only thing the district court did was say, look, this was a requirement for them to label this product so they knew how to use it. But when we look at the two causes of action that were actually tried before the court, there was absolutely no reference to that jury instruction or that element being a component as to each and every one of those two breaches that were alleged in the complaint and subsequently denied to the jury. Then what would be the reason for the jury instruction if it had nothing to do with the allegations in the complaint? You just conceded it had nothing to do with the allegations in the complaint. No. I conceded it's important for Mr. Milliken. So somehow it's evidence on the implied warranty or the express warranty issues? No. It was an important component of the case because it was required by statute. If you ---- It depends how you plead the case, though. I understand that. However, the important component is if it's not labeled by statute and you're being provided this product and it's not explained to you in this labeling requirement how to use it, you're suddenly left with it being dumped in your lap, use it, and then on the flip side as the defendant at that point is simply making the argument that you misused it. But you can't misuse something if you don't know how to use it when you have statutory duty to label it. And that's the problem with that particular situation. And that's why it was so important for the district court to weave this in as to the jury instruction. Let me ask you another question. You made a motion to amend your complaint to comply with the evidence, adding a claim based upon storage requirements for the milk permeant and that the product was good for cows. Was that ever granted? Specifically, it was not as far as the district court ---- You know, you said specifically. That's kind of a weasel word that bothers me because then you're going to say, well, but impliedly. I mean, either it was or it wasn't. The district court never granted that motion. It wasn't. It wasn't. So if it wasn't granted, if it weren't granted at that point, then why is it that we have jury instructions about it? Because it's implied that the district court granted it based upon that ---- The district court can just sit there and not ever make a ruling and then when they get to the end, you never renew your motion and automatically you get jury instructions upon something that was never ever put apart of the pleadings? No. Not without motion and without pleading it? It was made, and we can imply from the record that it was granted by those jury instructions. We imply that. The record is unclear, so that's the only thing we have before this court. Let me give you a hand. Another tact. When this ---- when the court gave the jury instruction, was there an objection to that jury instruction? As to? As to the court giving the instruction on labeling. Yes. That was a hotly contested issue. Oh, that's too bad. That's not the place to go. What was the basis of the objection that was made to the jury instruction? Well, my understanding from the record there was it was irrelevant. It didn't go to the issues that were before the court at this point, that being the two contract claims. However, we have always maintained that was important because of the reasons I previously stated that, look, if you don't know how to use this product, you can't assert these defenses of misuse or ---- So this issue was specifically before the district judge. He knew exactly what the arguments were and decided to give the jury instruction. Well, I guess I'm confused as to your question, Your Honor. Are you asking me to jump into the mind of the district judge at that point? Well, you can tell me if it was completely discussed before the district judge made his decision. The district judge says ---- And I think it's your position it was fully discussed. It was. There was a very vigorous argument when it came to instruction, but the district court says it's my recollection the plaintiff offered evidence regarding the labeling requirements during testimony, and I believe that came in without objection. But then it turns into a big fight over the instructions, and all the objections are made during the instruction conference. I want you to make an assumption for me. Let's assume for the sake of argument that we have some doubt about whether it should have been done. Was that prejudicial to the case? I don't believe so. Tell us why you don't think it would be prejudicial to the case. It's not prejudicial to the defendants because the jury instructions for the two causes of action that were tried before the district court clearly provided the jury with the instructions to find as to each and every element contained within the two warranty claims that were ultimately tried. And when we look at that, we look at those instructions, which are clear based upon Idaho law that, look, plaintiffs need to prove each and every element of those two instructions. That instruction could not have infected at all the jury's deliberations because those instructions were specifically given to the jury in order for you to find. And then we reference the special verdict form. It's clear that the jury followed those instructions, found the defendant 100% liable for the plaintiff's damages, and it can't be assumed or speculated that this jury instruction concerning the labeling issue had anything to do with affecting the jury's verdict. Given those two instructions as to the warranty claims, we're very clear as to what was required by plaintiffs to prove. Moreover, the actual causation instruction was also in a defense along with the two other defenses that the defendants put forth before the court at that time. So this labeling instruction simply provided guidance to the jury that, look, one of the elements that's in this case or one of the factors that you need to be aware of is the fact that the defendant was labeled. Mr. Millenkamp doesn't know how to use it. He doesn't know of its dangerous propensities, and he can't use it properly. And that's essentially what happened in this case. By them not labeling it, he was unable to properly use the product, and it resulted in the damages. So you're saying, among other things, it's a defense against misuse or assumption of the risk. Exactly. So it goes to those two issues. Let me go then to Exhibit Number 25, Ms. Klusinski's very hospitable letter written by Mrs. Manners herself. What in the world is the relevance of this letter? Well, the relevance, as we pointed out in our brief, and if I may turn there one moment. They're threatening to bring up the lawyers before the Idaho Bar for violation of the Idaho Rules of Professional Conduct, reprehensible slam bang. And then the letter was used very vigorously in argument to say this is a bad company. Well, that's what it was ultimately used in closing arguments. However, attorneys have wide discretion, wide latitude in making their closing arguments. What's the relevance? Well, if I may turn there one moment. There's no question it's a nasty letter. It's a settlement kind of a letter, and it puts the company in a very bad light. And, of course, so then it has to be relevant. It doesn't admit liability. And then puts in $500,000 in the letter, which might have influenced the jury a little bit to give a $300,000 award. Well, I think there's troublesome parts of this, and I agree with Judge Trott. What is the basis? What's the relevance of that letter? How did it get in? Under what basis? Well, what I pointed out in my brief is there's three reasons it was relevant. First, it was relevant to dispel the claims that the fiscal was in no way responsible. They made claims that they were not responsible. However, if we look at what was there, they made this claim that it was completely Mr. Mellencamp's fault. He did everything. However, this letter disputes that in the fact that they acknowledge in that letter that there was essentially some handling instructions that were given to them. I suspect it was used very well, and if I were the trial lawyer and I could get this one in, I would nail it to them. But on the other hand, the district court says this is a business record, therefore it's admissible. Now, this was a letter sent, as I understand it, to the Mellencamp's lawyer after they're involved in this dispute. Now, how is that ordinary business? It seems to me it's extraordinary business after you're in a dispute and you're running a word game with the lawyer. Was the district court correct that this was a business record and an ordinary course of business as a foundation to even admit it? Well, I think under the rule, which is 803.6, which it was entered into, I think it can qualify under that. However, what I would point to this Court, as you know, the legal standard for this Court was reversing on that basis, is whether or not that the evidence that was entered into as a result is that the trial courts have wide latitude in letting it in, and absent there being an express abuse of discretion by the court entering it into evidence, that it would not be proper. We do that. We have a very low standard involved for evidence because you go back at the end of the day and it usually doesn't make any difference anyway. But if this is truly not a business record, then you're getting pretty close to express abuse of discretion because there's no basis for getting it in. I understand where you're coming from, Your Honor. However, even if we were to assume that this document didn't even come into evidence, the clear evidence that was presented by the plaintiffs in this case easily warrant the jury's verdict. Well, what you're saying is there's no harm, no foul. And I understand that. That's the no prejudice issue. But come back once more to whether there was ever any basis for introducing this in the first place. Do you claim, I assume you did claim, that this is a business record. Tell me why this is a record that was made in the ordinary course of business. Well, my understanding from the document itself, I think it speaks for itself, that it was an ordinarily created document by the defendants, and it was sent to my client in the course or his representative in that course. And it was essentially the letter speaks for itself as to the nasty words that were put into it. But in any event, I think it qualifies under that standard, given what it was as far as Mr. Millenkamp's ordinary records that he maintained in the course of his business. Are statements made in the settlement process and in the exchange of letters on something like that admissible? Well, 408 controls that. Rule of evidence 408 controls that. And 408 says what? Well, settlement negotiations are not admissible. And this starts out in response to your letter of October 29, 2002. That's a letter from Mr. Holifield. Was that part of settlement negotiations? I don't think they're settlement negotiations. This letter was a threat that, look, if you pursue this claim, we're going to file a bar complaint against you. No, no, no, no. I mean, the letter that we're talking about, Sue Blasinski's letter, was sent in response to your letter of October 29, 2002. Your letter, your being William Holifield, attorney-at-law. What was the content of the letter of October 29, 2002? Well, it's clear from this letter there was a demand. That letter is not before the court at this point, and I don't think it's appropriate, given the fact that we're looking at essentially a no harm, no foul with this document being admitted, even if this court assumes it doesn't qualify under the business rights. So you're falling back into no harm, no foul. So even though this letter was used as a club to beat people over the head in final argument, we ought to just ignore it? No, I'm not saying that. What I'm saying is, is if we look at the contents of this letter, this letter doesn't qualify under 408. There's nothing explicit on the contents of the letter saying, look, this letter qualifies under federal rule of evidence 408. There's nothing in this letter other than, look, if you pursue this claim, we are going to essentially threaten you with a countersuit. We're going to report you to the bar for a bad faith claim. That's not a settlement negotiation. That is simply a threat of retaliation in and of itself. I construe the letter of October 29 to be a request to settle the case for $500,000. They say in here, you're a threat to the institute litigation unless we pay Milling Camp $500,000. So I assume it was an offer to settle the case for $500,000. It was a threat of retaliation that was contained within that letter itself. In any event, I'm well over my time. Thank you. I apologize. Well, my colleagues asked the question. You were on their time. You have 20 seconds, I think. I'll give you a minute 51, evidently. All right. Thank you, Your Honor. Do you agree this letter was no harm, no foul? Absolutely not, Your Honor. In their closing argument, as Your Honor has pointed out, they beat us over the head with it, and they certainly used that to emphasize these prejudices. In your view, does the letter fall within 408? Yes, it does. Why? Because for the reasons you pointed out, Your Honor, it was in response to a settlement offer. It was a response to that, and I think that falls within the purview of the rule. One thing I wanted to point out with respect to the labeling issue, I'd like to direct Your Honor's attention to paragraphs 41 through 46 of the plaintiff's complaint. This is their claim for negligence per se, and it quotes the Idaho regulation, the Idaho Administrative Code, requiring a label with adequate directions for use in precautionary statements, and alleges that Dubisco breached its duty by not providing those directions or precautionary statements. As we know, the negligence claim was dismissed on summary judgment, but the district court gave jury instruction number 32 over our objection, which directs the jury that there is a legal requirement that the permeate contain a label with directions for these precautionary statements. One final thing, in the plaintiff's complaint... I have one more question. I have one further question. Why'd you let them label it? I guess I'm overruled. On Exhibit 25, did you find which were the two objections you made? I believe 408 and irrelevance. Thank you. You believe or... 408 and irrelevance. See, those words make us nervous. Thank you. I understand. That's okay. All right. Thank you. Thank you very much. Thank you very much, counsel. Cases 07-35299 and 07-35318, Millicamp v. Dubisco Foods, is now admitted...submitted.
judges: Wallace, Trott, Smith